May it please the Court, Frederick Darley on behalf of the appellants Rowena Crowe and Robert Crowe, this is a pelvic mesh case that was dismissed by the District Court on defendants motion of summary judgment on the basis that Ms. Crowe's claims were time barred. There are two issues for this Court to decide. Number one, whether New Jersey's statute of limitations or Alabama's statute of limitations governs the claims in this case. It seems like the best case would be New Jersey, so let's talk about whether even under New Jersey it would nevertheless be untimely. Yes, Your Honor. So under New Jersey law, at a minimum, there are genuine issues of material fact that should be decided by a jury in this case. Well, here's the thing. So there are records that show that on August 5th, Your Honor told Dr. Brown she was experiencing pelvic pain and noted that the left side mesh was higher than the right side. The records also state that on January 12th, 2011, she told Dr. McCool she was worried something was wrong with her sling. The records state on May 24th, 2012, she asked Dr. Brown, does the mesh have anything to do with the pain and what if you release it? And despite Dr. Brown's uncertainty about the source of her pain and his warning that releasing the mesh could cause additional pain, she still allowed him to release the mesh during the surgery on October the 8th of 2012. And so it seemed to me that whether the doctors ever told her that they thought that the mesh was the problem, it looks to me undisputed that she suspected it might be. And she does not deny, from my reading of the record, that she said those things to the doctors. At best, she says, I don't remember. Well, Your Honor, I would argue that the record does show that she disputes those facts that the record says she was concerned or expressed concern. What she denied in her deposition was that the doctors ever told her that the mesh might be the problem. I could not find any testimony where she denied that she asked those questions. She said, I don't recall. I have no memory of the January 12th, 2011 visit. Couldn't recall what happened at these visits. But here we've got undisputed records that this is what she was at least telling them. And the mesh gets released, even though the doctor said, not sure that that's the source of the problem and that she won't have more pain. She was concerned enough about it, though, that the doctor did do that. Yes, Your Honor. But now, on that procedure where the mesh was released, the main reason and really the reason why she had that procedure was she was undergoing a hysterectomy. And during that hysterectomy, Dr. Robert Brown transected a portion of the mesh that had become tighter over time. The release of the mesh was not the main purpose of that surgery. I would say it was. And to be clear, Dr. Brown still testified that he did not believe that that mesh arm was the cause of her pain at that time. I understand. She was concerned that it might be. But she... That's what the undisputed medical records predating the limitations period would seem to establish. Well, Your Honor, I would say that she disputed those, that she expressed concern that the mesh was causing her pain at that time. That was... Volume 4, and her deposition at lines 81-3 through 83-19. She said she has no memory of her January 12, 2011 visit. Right. And she said she never asked Dr. Brown the name of the manufacturer of the mesh. Or if the TVTO, one of the mesh devices, was causing her pain. Volume 4, document 928, colon 162. She didn't recall ever expressing concern to Dr. Brown. She was worried something was wrong with her sleep. That is not a denial. That's just, I don't remember that. Well... And her lack of memory about that doesn't create a genuine dispute of material fact, it seems to me. Well, Your Honor, and again, Dr. Brown nor Dr. McCool ever informed Ms. Crow that the mesh devices were causing her pain. And... But that's not really what matters. The question is, does she suspect it? Well, she did not suspect it because she was told that she had a herniated disc. Dr. Brown, in fact, referred Ms. Crow to an orthopedic doctor, who Ms. Crow saw treatment with for the next several years. Ms. Crow was repeatedly told by the orthopedic doctor and by Dr. Brown himself that they believed her pain was a result of a herniated disc. Ms. Crow even underwent several back surgeries because she was of the understanding, based on her continued consultation with her doctors, that her pain was the result of a herniated disc. I want to be clear. I feel, on a personal basis, very badly for Ms. Crow and what happened to her. I really do think it's terrible. And we all hope that we can trust our medical professionals. But it appears to me, too, that the record reflects that she did know better than her doctors, in a sense, about what was causing her problems. And the rule is not that your time to sue runs when your doctors realize or agree with you that you may have a basis to sue. It's when you suspect or have reason to believe that that may be the source of the problem. And so, given that the standard isn't your doctors agree, but the standard is that you have some reason to think, why doesn't the evidence here show that she had reason to think and then was steered in the wrong direction by her doctors? Yes, and I agree with your assessment of that, Judge Grant. I don't think that you have to have that. You certainly don't have to have that legal certainty in order for a claim to accrue. But it's a fact that it's a problem, even though the doctors say otherwise. You can. You certainly can. It can be a problem. You agree. It would be. But in this case, Ms. Crow did not have that suspicion because not a few medical records would suggest that. Well, I think that one thing that could, one point to make is that once Ms. Crow did suspect that the mesh could be the cause of her pain, at that point, that's when she consulted with an attorney. And counsel filed a claim on her behalf several months later. And that was in 2015. If she did, if she had a suspicion prior to then that the mesh was the cause of her pain, she would have contacted an attorney earlier. But she didn't have any reason to suspect that the mesh could be the cause of her pain because no one ever told her that. If the court doesn't have any questions, I'll reserve the rest of my time for rebuttal. All we need to do is concentrate on her deposition about that. Yes, Your Honor. I would agree with that. Okay. Thank you. You've saved five minutes for rebuttal. May it please the Court. Susanna Moldavenu for Appellees Johnson & Johnson and Ethicon. Appellants state over and over in their briefs and here today that Ms. Crow believed until 2015 that her pain was caused by a herniated disc and not her mesh. But you'll notice that they never cite anything for that statement. Ms. Crow never said in her deposition that she didn't know that. She did not submit any such affirmative evidence in opposition to defendant's motion for summary judgment. The only time point where Ms. Crow testified that she believed her issues were caused by her back was August 5, 2010. She testified to that in her deposition. Other than that, an appellant is asking you to assume what she believed based on what they say her doctor believed. Now, it's true that Dr. Brown did not believe that the mesh was the cause of Ms. Crow's injuries. This is true. But the question here is not what Dr. Brown believed. It's what Ms. Crow knew or what she should have known. What reasonable medical information did she have that should have informed her knowledge as to the source of her pain? The medical records are replete with references to the health care providers telling her that there was tension in her sling. And so that provided the reasonable medical information. Now, there was some question of whether the doctors believed that that was the actual cause of her alleged injuries. But there was reasonable medical information that there was, quote, tension in that sling. And even though Dr. Brown did not believe that that was the cause of her injuries, he offered a procedure to her to correct that. And she decided to have that procedure. Absolutely. The medical records state on October 8, 2012, that he was, quote, that this is the etiology of her pain. Discuss options in detail. The patient wished to proceed. Now, the appellant here today says, well, that was not the primary purpose of that procedure. There was also a hysterectomy. But the plaintiff signed a consent form for this release procedure that clearly stated it was a revision of anterior prolift, and, quote, release anterior mesh. I'm going more, I think, saying that she should have known that she had a claim because her doctor said there was tension in her mesh when the doctor said, but I don't think that's the problem. I think the better evidence is her own concerns about the mesh based on how she was feeling. Absolutely, Your Honor. It was a response to Judge Kidd's question about what was the medical information that she had received. But over and over throughout the medical records, we don't have to guess about what the plaintiff believed to be the cause of her injuries because we have it memorialized in the records. And there are many of those records that the plaintiff disputes, but many of them she doesn't dispute. And the ones I'm going to talk about here today are not disputed. On January 12, 2011, as Your Honor has already pointed out, she went to her medical provider and the records reflect that she was, quote, tearful, worried that something is wrong with her sling. It feels terrible all the time. It hurts all the time. As I understand it, she doesn't remember that visit. She testified that she could not recall it. And as Your Honor has noted, a failure to recall an event does not create a genuine issue of material fact. This is set forth in all of the authorities cited on page 40 of our brief. Then after that, May 24, 2012, now this is two months after the plaintiff's second back procedure, the plaintiff returned to her OB-GYN reporting pain in her vaginal and pelvic region with a severity of 10 out of 10. The records note she asked, does the mesh have anything to do with her pain and what if you release it? Does it have metal in it? The records note that the plan at that time was to wait on the release for now and see if the disc surgery helps. Surgery for release may cause more pain for now. So this is two months after the second back procedure. So this is not a situation like in some of the authorities cited in the appellant's brief where she went to the OB-GYN, was told it was something else, and that was that. Ms. Crow is continuing to tell her doctor she believes the mesh might be the cause of her issues and she never sets aside that belief. Plaintiff again... I'm sorry that she was right, right? I mean, that is, you know, I think we'd all agree that it's tragic that she turned out to be correct. Well, we would dispute that in the liability phase of this trial, but for here today we're here to talk about statute of limitations. But I do want to take some issue with the story that the plaintiff has told and the appellant here today, that the appellant had no idea that her injuries were possibly caused by the mesh until she saw Dr. Galloway in 2015. That story is just not supported in the record. The record shows that the same course continues, that she continues to go to her doctors, and that she believes that the injuries were caused by her back and her mesh, and this makes sense. I just want to try to understand the record and just cut to the chase about this. There were three places in the record where it seemed to me she had expressed that concern. One was the August 5, 2010 visit to Dr. Brown, where she identified the left side mesh was tighter than the right side. The second was the January 12, 2011, which you referred earlier, where she said that she was worried something was wrong with her sling. That's what the medical record reflects. And then the May 24, 2012 visit to Dr. Brown, where she asked, does the mesh have anything to do with it? What if you release it? Then, of course, on October 8, 2012, during that surgery, it is released, even though the doctor told her it might cause more pain and he didn't think that was the source of the problem. All of that being before, of course, August 20, 2013, the important date for statute of limitations purposes. I don't see anything in the record where she ever denies making those inquiries on those dates. Is there anything else? I might also add the July 24, 2012 record, which is Docket Entry 9213 of Appendix 4. At that record, the medical records are noting that the left deep arm is slightly tight, pain is higher in the abdomen, and the plan at that time was, quote, consider release of left deep arm of anterior repair. She will let us know, wants to try BHRT first. So it's not the same where she's expressing the cause, but it's still a reflection where she is engaging with them, with her health care providers, about the mesh. Certainly, Your Honor, but I did want to add that she was not asked about that particular record one way or the other in her deposition. This story, though, that she had no idea until she went to Dr. Galloway, the plaintiff disputed that in her own testimony. Before she went to Dr. Galloway, she went to a Dr. Dorchak in 2015 and told him, I would like the mesh removed. And he said that he didn't do that, but he knew somebody that could, and he referred me to Dr. Galloway. So at best, Dr. Galloway confirmed what the plaintiff already believed, that the mesh was the cause of her pain. Correct myself, I should say a cause of the pain. And the a cause is important because it's not required for the mesh to be the only cause. If the back and the mesh together were causing issues and she had reason to believe that, that would be sufficient. It's caused or contributed to. Correct, Your Honor. The real story that the record shows is that she believed that her injuries were caused by her mesh or at a minimum by the back and the mesh. And this makes sense. She was following up with both doctors during this entire time period. And we haven't even discussed the FDA's public health notice. Dr. Brown's notes state that he had told the plaintiff about the FDA public health notice. And the plaintiff has disputed that she read the public health notice, but she has never said that she was not told of it. So Dr. Brown's testimony that he told her about it, he testified that there was an advisory committee on meshes and concern for vaginal mesh. There was a group of patients that had issues after mesh placement and they were lobbying the FDA to take it off the market. Question, and you told her about that? Answer, I did. Now she rebuts that she actually went and read the FDA advisory, but she never rebuts that Dr. Brown told her about it. And even just in cases where there was inquiry notice, there are many courts' decisions cited on pages 44 to 46 of our brief where courts held that the FDA advisory committee notice provides inquiry notice of a claim. Here we've got actual notice in addition to the inquiry notice. In the few minutes remaining, I'd like to just briefly touch on something that hasn't been mentioned here today, which is choice of law. If what the appellants say is true, that their claim is timely under New Jersey law, and as you know we certainly disagree with that, then there is a true conflict of law and the court is obligated to engage in a choice of law analysis. We disagree that if the best case scenario is New Jersey law and it's untimely under that, that's it, isn't it? It is. If it's untimely under New Jersey law, then that ends the inquiry. But even if what appellant says is true, and so this is an additional hurdle that the appellant has to overcome, and he has not cited a single case in his reply brief where a court has considered the retroactivity of McCarroll and reached a different conclusion than Judge Harz in the Pelvic Mesh MCL. Right now, the only decision of which we are aware addressing the retroactivity of the McCarroll decision on choice of law is Judge Harz's decision in the Pelvic Mesh MCL where she analyzed this issue and held that McCarroll does not apply retroactively. So this lawsuit was filed in 2015 and at that time the choice of law analysis in New Jersey was governed by the Camp JC case, that if the court reaches the choice of law issue, which we submit that you should not, but if the court reaches the choice of law issue, the Camp JC case analysis applies. Alabama law has the most significant relationship to this issue under the Camp JC analysis because all of the facts in this case took place in Alabama. An appellant concedes that if Alabama law does apply to the statute of limitations, their claims are time barred. So this is just an additional grounds for affirmance here. Okay. Thank you. Thank you, Your Honor. Your Honor, as to the August 5, 2010 visit, Ms. Crow, reading from her deposition transcript and I'm at lines 159.9 through 162, the question, do you agree with the notes here in the record on August 5, 2010 that you would have expressed concern that the pain was related to your mesh implant procedure done in July of 2007? Ms. Crow's answer, I disagree with that is not something that I said. I remember being in a lot of pain. I was crying. After the exam, I was told I had a herniated disc. I was a bit of relief that I felt that Dr. Brown had, this was going to stop my pain. He had found what my problem was. I had a herniated disc and that he was going to make an appointment with me the next day and I was going to get an MRI. I felt like, wow, the answer's coming and an answer to this pain. So, Your Honor, She did not say that the left side, saying that the left side mesh was tighter than the right side on that day. Your Honor, she did not specifically recall that and she did not, she did not recall saying that. Dr. Brown also, January the 12th, right? She reported something was wrong with her sleeve. Right. And I understand the notes in the records. However, the notes in the records cannot trump her testimony, nor Dr. Brown's. Ms. Crow did not have any reason to suspect that the mesh was causing her pain at that point. She was never told by anyone, so there really was no reason for her to have that suspicion. Did she also bring in a picture of the device at one point in November 2011 and show that to Dr. Brown and ask what that was in? She disputes doing that as well. I'm not sure why those notes are in the records. Dr. Brown did not recall that either. And Ms. Crow certainly did not corroborate that that happened. I believe that she testified that she did not recall doing that.  I think her testimony was that she didn't know what it was, she didn't know what a Prolif was when she saw the picture, but she wanted to make sure she didn't have that in her body. Yes, that is correct. That was a note that was in the records. However, Ms. Crow disputes that that happened and disputes bringing any device in. I don't know how she would bring anything in to the office. And furthermore, I think that it's important to note Mr. Crow's testimony regarding the visit with Dr. Galloway at Emory University in 2015. Mr. Crow testified in his deposition that the appointment with Dr. Galloway was, in his mind, transcendental. And at that point, that's when he and Ms. Crow made the connection between the pain that she had been having and defendant's mesh devices. Prior to that, she did not have any reason to have that suspicion. If she had suspected, and let's hypothetically say for a minute that Ms. Crow did have that suspicion that the mesh devices were the cause for her pain. Every single one of her doctors between 2010 and 2015 disputed that and adamantly told her that they did not believe that her problems were a result of the mesh. So to require her to file suit even when her doctors are telling her that her problems are not a result of defendant's mesh devices would essentially require her to go against what her doctors have been telling her and require her to file suit even though her doctors have been telling her there was no connection between her pain and the defendant's mesh devices. Do you know where her doctors were located? Her doctors were located in Fairhope, Alabama. And in 2013, Ms. Crow and her husband moved to near Phoenix City, Alabama. And then she started going to the Houston Clinic over in Columbus for orthopedic treatments because, and again had surgery, another back surgery in 2014 because she continued to believe that her pain was a result of a herniated disc. Okay, Mr. Darley, thank you. We have your case, and we're going to be in recess until tomorrow. Thank you.